**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4660

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

JAMES WILLIAM HILL, III,

Defendant - Appellee.

------------------------------

MATTHEW SHEPARD FOUNDATION; FREESTATE JUSTICE, INC.; LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INCORPORATED; THE ANTI-DEFAMATION LEAGUE; TREVOR PROJECT; PUBLIC JUSTICE CENTER; JAPANESE AMERICAN CITIZENS LEAGUE,

Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. John A. Gibney, Jr., District Judge. (3:16-cr-00009-JAG-1)

Argued: March 20, 2019                     Decided: June 13, 2019

Before MOTZ, AGEE, and WYNN, Circuit Judges.

Reversed and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Motz joined. Judge Agee wrote a dissenting opinion.

**ARGUED:** Vikram Swaruup, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C, for Appellant. Patrick L. Bryant, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellee. **ON BRIEF:** Eric S. Dreiband, Assistant Attorney General, Thomas E. Chandler, Tovah R. Calderon, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; G. Zachary Terwilliger, United States Attorney, Alexandria, Virginia, S. David Schiller, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellant. Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Mary E. Maguire, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia; Elizabeth W. Hanes, CONSUMER LITIGATION ASSOCIATES, P.C., Richmond, Virginia, for Appellee. Jennifer L. Kent, FREESTATE JUSTICE, INC., Baltimore, Maryland; Joseph Dudek, GOHN HANKEY & BERLAGE LLP, Baltimore, Maryland; Omar Gonzalez-Pagan, Cathren Cohen, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., New York, New York, for Amici Curiae.

---

WYNN, Circuit Judge:

In this appeal, we confront the issue of whether the federal Hate Crimes Prevention Act of 2009 ("Hate Crimes Act"), 18 U.S.C. § 249(a)(2), may be constitutionally applied to an unarmed assault of a victim engaged in commercial activity at his place of work. This appears to be an issue of first impression in this Circuit or any other.

Defendant James Hill, III ("Defendant") boastfully admitted to physically and violently assaulting a coworker preparing packages for interstate sale and shipment because of the coworker's sexual orientation. But after a jury convicted Defendant for violating the Hate Crimes Act, the district court granted Defendant's motion for judgment of acquittal on grounds that the Hate Crimes Act, as applied to Defendant's conduct, exceeded Congress's authority under the Commerce Clause. Because we conclude that as applied to Defendant's conduct, the Hate Crimes Act easily falls under Congress's broad authority to regulate interstate commerce, we reverse and remand to the district court to reinstate the jury's guilty verdict.

I.

At the time of the assault, Defendant and Curtis Tibbs ("Tibbs")[1] were coworkers at an Amazon fulfillment center in Chester, Virginia. Defendant worked as a "re-binner" at the facility, moving items from conveyor belts and placing them into bins in a wall.

---

[1] When this case was previously before this Court, the parties referred to Tibbs as "C.T." On appeal, both parties refer to "C.T." by his full name. Therefore, we have also done so.

Tibbs worked as a "packer," loading these items from the bins into boxes for packaging, scanning them, packaging them in a box, and then placing the boxes on a conveyor belt to move to the next department.

Video shows that shortly after the beginning of Tibbs's shift on May 22, 2015, as Tibbs carried items to load into a box, Defendant approached Tibbs from behind and—without provocation or warning—repeatedly punched him in the face. As a result of the assault and battery, Tibbs suffered significant bruising, cuts to his face, and a bloody nose. After the incident, Tibbs went to Amazon's in-house medical clinic and then to the nearest hospital for treatment. Tibbs did not return to work on the production line for the remaining several hours of his ten-hour shift. Amazon shut down the area of the incident for approximately 30–45 minutes to clean blood off the floor, but Amazon did not miss any "critical pull times," or packaging deadlines, as a result of the incident because other areas of the facility absorbed the work. J.A. 24. An expert witness testified that, notwithstanding Tibbs' absence and the temporary closure of his workspace, the performance of the fulfillment center as a whole during the shift in which the incident occurred was in-line with its performance during other shifts.

Defendant told an Amazon investigator and a local police officer that he assaulted Tibbs solely because Tibbs was gay. In particular, Defendant stated that "his personal belief is he didn't like [homosexuals]," that Tibbs "disrespected him because he is a homosexual," and that Defendant "does not like homosexuals, so he punched [Tibbs]." J.A. 353, 383. Defendant offered no other explanation for the assault.

4

The Commonwealth of Virginia initially charged Defendant with misdemeanor assault and battery in state court, but the state prosecutor subsequently requested that the United States "assume prosecution of this case as a hate crime" under the Hate Crimes Act, in part because Virginia's hate crime statute does not cover crimes based on sexual orientation. J.A. 25.

On July 24, 2015, the United States Attorney General certified that Defendant's prosecution under the Hate Crimes Act "is in the public interest and is necessary to secure substantial justice." J.A. 25. Thereafter, the Commonwealth of Virginia dropped the misdemeanor assault charge, and on January 19, 2016, a federal grand jury indicted Defendant under the Hate Crimes Act, 18 U.S.C. § 249(a)(2). The indictment stated that:

> On or about May 22, 2015 . . . [Defendant] did willfully cause bodily injury to [Tibbs] by assaulting [Tibbs], including by punching [Tibbs], because of [Tibbs's] actual and perceived sexual orientation, namely that he is gay; and that, in connection with the offense, [Defendant] [1] interfered with commercial and other economic activity in which [Tibbs] was engaged at the time of the conduct, and which offense [2] otherwise affected interstate and foreign commerce.

J.A. 19.

Defendant moved to dismiss the indictment, arguing in relevant part that Section 249(a)(2) of the Hate Crimes Act, on its face and as applied to him, exceeded Congress's power under the Commerce Clause. The district court agreed with Defendant's as-

5

applied challenge and dismissed the indictment.[2] *United States v. Hill*, 182 F. Supp. 3d 546, 555–56 (E.D. Va. 2016). The Government appealed the district court's dismissal.

In an unpublished opinion, a divided panel of this Court reversed and remanded the district court's decision with directions to reinstate the indictment. *United States v. Hill*, 700 F. App'x 235 (4th Cir. 2017). The majority opinion stated that "[o]n its face, the indictment is legally sufficient and does not present an unconstitutional exercise of Congressional power." *Id*. at 236–37. However, because the case presented an as-applied challenge, the majority opinion further concluded that it was "premature to determine the constitutional issues" because "whether [Defendant's] conduct sufficiently affects interstate commerce as to satisfy the constitutional limitations placed on Congress' Commerce Clause power may well depend on a consideration of facts, and because the facts proffered here may or may not be developed at trial." *Id*. at 237. Therefore, the majority opinion did not resolve the merits of Defendant's Commerce Clause challenge.

On remand, the Government dropped reliance on the statutory element that the offense "otherwise affect[ed] interstate or foreign commerce." 18 U.S.C. § 249(a)(2)(B)(iv)(II). Instead, the Government relied exclusively on the theory that Defendant's assault of Tibbs "interfere[d] with commercial or other economic

---

[2] The district court did not address Defendant's facial challenge to the Hate Crimes Act. Because the parties have not briefed the issue of whether the Act is facially valid, we also decline to decide this issue.

activity in which the victim [was] engaged at the time of the conduct." *Id.* § 249(a)(2)(B)(iv)(I); J.A. 440.

The district court held a two-day jury trial beginning on January 22, 2018. The district court instructed the jury that the Government must prove beyond a reasonable doubt that (1) Defendant caused bodily injury to Tibbs; (2) Defendant did so willfully; (3) Defendant did so because of Tibbs's actual or perceived sexual orientation; and (4) Defendant's conduct "interfered with the commercial or economic activity in which Tibbs was engaged at the time of the conduct." J.A. 541. The jury found Defendant guilty.

Thereafter, pursuant to Federal Rule of Criminal Procedure 29, Defendant moved for judgment of acquittal, arguing that the Hate Crimes Act is unconstitutional as applied to his assault of Tibbs. The district court granted Defendant's motion, concluding that the Hate Crimes Act as applied exceeds Congress's Commerce Clause authority. Specifically, the district court held that the Hate Crimes Act as applied does not regulate activity that substantially affects interstate commerce. The Government timely appealed the district court's judgment of acquittal.

## II.

On appeal, the Government argues that the district court erred in granting Defendant's motion for judgment of acquittal on grounds that the Hate Crimes Act, as applied to Defendant's conduct, exceeds Congress's authority under the Commerce Clause. We review de novo a district court's award of judgment of acquittal. *United States v. Singh*, 518 F.3d 236, 246 (4th Cir. 2008). To the extent that there are factual

7

disputes, we view "the evidence in the light most favorable to the Government," which prevailed at trial. *Id.* at 252.

A.

It "is a well-worn yet ever-vital maxim that the Constitution creates a Federal Government of enumerated powers." *United States v. Bollinger*, 798 F.3d 201, 208 (4th Cir. 2015) (alterations and internal quotation marks omitted) (quoting *United States v. Lopez*, 514 U.S. 549, 552 (1995)). Among these enumerated powers, the Commerce Clause permits Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

Under the Supreme Court's modern Commerce Clause jurisprudence, "Congress is limited to regulating three broad categories of interstate activity: (1) 'the use of the channels of interstate commerce,' (2) 'the instrumentalities of interstate commerce, or persons or things in interstate commerce,' and (3) 'activities that substantially affect interstate commerce.'" *Bollinger*, 798 F.3d at 209 (quoting *Lopez*, 514 U.S. at 558–59). In limiting federal authority to these categories, the Supreme Court has consistently invoked themes of federalism and its view that "Congress's interstate power must be 'read carefully to avoid creating a general federal authority akin to the police power.'" *Id.* at 211 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012)).

Congress paid close attention to the scope of its authority under the Commerce Clause when it enacted the Hate Crimes Act, which was designed to strengthen federal efforts to combat violent hate crimes—crimes targeting victims based on certain

8

enumerated characteristics. National Defense Authorization Act for Fiscal Year 2010, Pub. L. 111-84, §§ 4701–13, 123 Stat. 2190, 2835–44 (2009). The statute's substantive provisions are preceded by congressional findings regarding the prevalence and impact of violent hate crimes throughout the country, as well as Congress's intent to assist state and local efforts to combat such violence. *Id.* § 4702.

Distinguishing hate crimes from other violent crimes—over which, Congress emphasized, States continue to retain exclusive prosecutorial authority—Congress concluded that violent hate crimes "substantially affect[] interstate commerce in many ways." *Id.* § 4702(6). Among these effects, Congress explained that:

(A)     The movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence.

(B)     Members of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity.

(C)     Perpetrators cross State lines to commit such violence.

(D)     Channels, facilities, and instrumentalities of interstate commerce are used to facilitate the commission of such violence.

(E)     Such violence is committed using articles that have traveled in interstate commerce.

*Id.* As such, Congress concluded that "[f]ederal jurisdiction over certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes." *Id.* § 4702(9).

To achieve this state-federal collaboration, the Hate Crimes Act created several federal criminal offenses arising out of violent acts undertaken with animus towards

9

various actual or perceived personal characteristics of the victim. Of particular relevance, the statute provides that any person who, under certain specified circumstances, "willfully causes bodily injury to any person . . . because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person . . . shall be imprisoned not more than 10 years." 18 U.S.C. § 249(a)(2)(A)(i). Such conduct may be prosecuted under the statute when it, *inter alia*, "interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct." *Id.* § 249(a)(2)(B)(iv)(I).

In adopting the Hate Crimes Act, Congress sought to "invoke the full scope of [its] Commerce Clause power, and to ensure that hate crimes prosecutions brought under [§ 249(a)(2) would] not be mired in constitutional litigation." H.R. Rep. No. 111–86, at 15 (2009). To ensure that conduct criminalized under the statute would have "the requisite connection to interstate commerce," Congress adverted to several Supreme Court decisions setting forth the outer limits of Congress's authority under the Commerce Clause—including *United States v. Lopez*, in which the Supreme Court held that a federal statute proscribing possession of guns in school zones violated the Commerce Clause, 514 U.S. at 567, and *United States v. Morrison*, in which the Supreme Court held that a federal statute providing a civil remedy for victims of gender-motivated violence violated the Commerce Clause, 529 U.S. 598, 601–02 (2000), *see id.* ("To avoid constitutional concerns arising from the decision in [*Lopez*], the bill requires that the Government prove beyond a reasonable doubt, as an element of the offense, a nexus to interstate commerce in every prosecution brought under one of the newly created categories of 18 U.S.C.

10

249(a)(2).”); *see also id.* (explaining that the interstate commerce element was "drawn to comport with Supreme Court guidance in *Lopez* and [*Morrison*]”); *id.* (explaining that "[t]he interstate commerce nexus required by the bill is analogous to that required in other Federal criminal statutes," such as the Church Arson Prevention Act of 1996, 18 U.S.C. § 247). Without question, the Hate Crimes Act reflects Congress's carefully considered judgment that the scope of the statute complies with Congress's authority under the Commerce Clause, as that authority has been understood by the Supreme Court.

Here, the Commonwealth's Attorney in Chesterfield County recognized that Defendant could not be prosecuted for a hate crime in Virginia for his admission of having assaulted Tibbs because he is gay. That is because the Virginia assault statute that includes enhancements for hate crimes does not include increased punishment for crimes involving sexual orientation. Va. Code Ann. § 18.2–57 (covering assaults and batteries resulting in bodily injury committed because of race, religious conviction, color, or national origin).

But because Tibbs was assaulted while preparing packages for interstate sale and shipment, the Commonwealth's Attorney's Office in Chesterfield County decided to specifically refer this case to the U.S. Attorney's Office for the Eastern District of Virginia. Following the U.S. Attorney General's certification that prosecuting Defendant at the federal level is in the public interest and is necessary to secure substantial justice, the Government indicted Defendant under the Hate Crimes Act. Defendant's prosecution therefore additionally reflects the considered judgment of both the Attorney General and

11

Commonwealth of Virginia that the statute's scope neither exceeds Congress's Commerce Clause authority nor interferes with the Commonwealth's police power.

B.

Against this legal backdrop, the Government contends that the district court erred in holding that Defendant's assault and battery of Tibbs lacked sufficient connection to interstate commerce to support Defendant's conviction under the Hate Crimes Act. Specifically, the Government emphasizes that the jury found that the assault and battery—which occurred while Tibbs was working as an Amazon employee and preparing packages for interstate sale and shipment—"interfere[d] with commercial or other economic activity in which [Tibbs was] engaged at the time of the [assault]." 18 U.S.C. § 249(a)(2)(B)(iv)(I). According to the Government, that finding renders Defendant's conviction consistent with Congress's Commerce Clause authority.

Whether the Hate Crimes Act may be constitutionally applied to an unarmed assault of a victim engaged in commercial activity at his place of work appears to be an issue of first impression in this Circuit or any other. *See, e.g.*, *United States v. Miller*, 767 F.3d 585, 589, 602 (6th Cir. 2014) (reversing Hate Crimes Act convictions due to erroneous jury instructions and declining to consider an as-applied challenge to the prosecution of a series of assaults on Amish men); *United States v. Mason*, 993 F. Supp. 2d 1308, 1317 (D. Or. 2014) (rejecting an as-applied challenge involving an assault with a weapon, but noting that "it might be unconstitutional to apply the [Hate Crimes Act] . . . if the weapon [the defendant] used had not traveled in interstate or foreign commerce, or if he had not used any weapon at all"); *United States v. Jenkins*, 909 F. Supp. 2d 758,

12

764, 773 (E.D. Ky. 2012) (concluding, albeit reluctantly, that the Hate Crimes Act is constitutional as applied to defendants who kidnapped and transported the victim along a federal highway).

Despite this lack of precedential guidance, the parties agree that Defendant's conviction is constitutional, if at all, as an effort to regulate "activities that substantially affect interstate commerce." *Bollinger*, 798 F.3d at 209 (internal quotation marks omitted). The Government argues that, by "interfering" with Tibbs's packaging and shipping of products, Defendant's conduct "substantially affect[ed] interstate commerce," as that phrase has been interpreted in decisions upholding federal prosecutions for robbery and extortion under the Hobbs Act, 18 U.S.C. § 1951(a), and arson under 18 U.S.C. § 844(i). We agree.

Similar to the Hate Crimes Act, the Hobbs Act includes an interstate commerce element, establishing a federal crime for robbery or extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a); *see also Taylor v. United States*, 136 S. Ct. 2074, 2080 (2016) ("[T]he Hobbs Act . . . contains such a[] [jurisdictional] element—namely, the conduct criminalized must affect or attempt to affect commerce in some way or degree."). The Supreme Court addressed a Commerce Clause challenge to the Hobbs Act in *Taylor*, which involved the prosecution of a defendant who attempted to steal marijuana and cash from two drug dealers. 136 S. Ct. at 2078–79. The Court held that the defendant's prosecution complied with the Commerce Clause, characterizing its holding as "straightforward and dictated by [the Court's] precedent." *Id.* at 2077.

13

Specifically, the Court explained that Congress's authority to regulate purely intrastate production, possession, and sale of marijuana—due to the aggregate effect of those activities on interstate commerce—compelled the conclusion that Congress may likewise regulate conduct that interferes with or affects such activities. *See id.* at 2080.

*Taylor,* the Supreme Court held, was controlled by the Court's decision in *Gonzales v. Raich*, 545 U.S. 1 (2005). In *Raich*, the Supreme Court analyzed Congress's authority to regulate the marijuana market, concluding that Congress may "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Taylor*, 136 S. Ct. at 2080 (quoting *Raich*, 545 U.S. at 17). The *Taylor* Court explained that its holding "require[d] no more than that we graft our holding in *Raich* onto the commerce element of the Hobbs Act." *Id.*. Because "the activity at issue [in *Taylor*], the sale of marijuana, is unquestionably an economic activity . . . [i]t therefore follows as a simple matter of logic that a robber who *affects or attempts to affect* even the intrastate sale of marijuana . . . *affects or attempts to affect* commerce over which the United States has jurisdiction." *Id*. (emphasis added). Notably, the Court explained that the Government did not need to provide evidence of *the robbery's* impact on interstate commerce because "[b]y targeting a drug dealer in this way, a robber necessarily affects or attempts to affect commerce over which the United States has jurisdiction"—namely, the sale of marijuana. *Id*. at 2078.

*Taylor*, therefore, establishes that, pursuant to its power under the Commerce Clause, Congress may proscribe violent conduct when such conduct interferes with or

14

otherwise affects commerce over which Congress has jurisdiction.[3] *See id.* Importantly, Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a "minimal" effect on such commerce. *Id.* at 2079, 2081; *see also United States v. Williams*, 342 F.3d 350, 354 (4th Cir. 2003) (noting that *Lopez* and *Morrison* "do not disturb our continued application of this 'minimal effects' standard [to

---

[3] Our dissenting colleague suggests that *Taylor*'s analysis as to the scope of Congress's authority under the Commerce Clause to proscribe violent conduct is *sui generis*—that it extends only to "Hobbs Act robberies in which a defendant targets drugs or drug proceeds." *Post* at 56. But contrary to that assertion, *Taylor* expressly followed the Supreme Court's decision in *Raich*—a decision which places itself in the mainstream of the Supreme Court's "modern-era Commerce Clause jurisprudence" and which is unrelated to the Hobbs Act. 545 U.S. at 23. This Court does not have license to reject the generally applicable reasoning set forth in a Supreme Court opinion. *See Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008) (Gorsuch, J.) ("[O]ur job as a federal appellate court is to follow the Supreme Court's directions, not pick and choose among them as if ordering from a menu."). Additionally, any holding that *Taylor*'s construction of the scope of Congress's authority under the Commerce Clause extends only to a subset of Hobbs Act cases would amount to an impermissible policy decision by the judiciary to favor one class of violent offenders—individuals, like Defendant, who engage in bias-motivated workplace violence—over another class of violent offenders—individuals who rob drug dealers. The Constitution assigns that policy choice to the political branches, not the courts. *See Dowling v. United States*, 473 U.S. 207, 214 (1985) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment." (quoting *United States v. Wiltberger*, 5 Wheat. 76, 95 (1820)).

The dissenting opinion further states that unlike *Taylor*, which involved "purely intrastate activities that can be regulated as part of the comprehensive regulation of an interstate economic market," this case does not involve an "interstate economic market." *Post* at 56. To the contrary, the Hate Crimes Act does not criminalize all intrastate hate crimes, but rather only those hate crimes that interfere with an employee's ongoing commercial and economic activity. Here, there is no question that workers, like Tibbs, are part of the "interstate economic market[s]" for labor and retail goods. And, in this as-applied challenge, there also is no question that Defendant's assault of Tibbs interfered with his preparation of goods for interstate sale and shipment.

15

Hobbs Act prosecutions]"); *id.* (collecting circuit cases that have "uniformly held that the Hobbs Act's jurisdictional predicate still requires only a minimal effect on commerce").

Like the Hobbs Act and the Hate Crimes Act, the federal arson statute includes an interstate commerce element, establishing a federal crime for burning "any . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). Thus was found to be so in *Russell v. United States*, 471 U.S. 858 (1985), in which the Supreme Court unanimously held that the Government constitutionally applied the arson statute to prosecute a defendant who set fire to a two-unit apartment building. *Id.* at 858–62.

In reaching that conclusion in *Russell*, the Court noted that the statute's broad phrasing—covering any property used in an activity affecting interstate commerce—was intended to "protect all business property, as well as some additional property that might not fit that description." *Id.* at 862. The rental property at issue was "unquestionably" covered by the statute, the Court explained, because "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties," and "[t]he congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." *Id.* As in *Taylor*, the Court thus held that Congress may regulate violent conduct when such conduct interferes with or affects commerce subject to congressional regulation—there, the commercial market in rental properties. *See United States v. Garcia*, 768 F.3d 822, 829–30 (9th Cir. 2014) ("[T]he congressional power to regulate

16

the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." (quoting *Russell*, 471 U.S. at 862)).

The Supreme Court again addressed the constitutional sweep of the federal arson statute in *Jones v. United States*, 529 U.S. 848 (2000). There, the Court construed the statute to permit the Government to pursue a prosecution *only* when a defendant's conduct affects "property currently used in commerce or in an activity affecting commerce," thereby excluding private residences lacking a nexus to interstate commerce. 529 U.S. at 859. In so doing, the Court sought to avoid the potential constitutional concerns that may have arisen had Congress sought to "render . . . traditionally local criminal conduct . . . a matter for federal enforcement." *Id.* at 858 (internal quotation marks omitted). As in *Russell*, the Court's analysis in *Jones* makes plain that when a defendant's conduct interferes with or otherwise affects commerce subject to congressional regulation, that conduct may be federally regulated under the Commerce Clause.

Following *Jones*, this Circuit has affirmed federal arson convictions in cases involving defendants who set fires to a restaurant and a church providing daycare services because those buildings were "actively engaged in commercial activity." *See United States v. Terry*, 257 F.3d 366, 370 (4th Cir. 2001) ("Regardless of the [church's] effect on interstate commerce, the daycare center's presence transformed the building into one that was being actively employed for commercial purposes"); *United States v. Aman*, 480 F. App'x 221, 223 (4th Cir. 2012) (noting, in a case dealing with the arson of a restaurant, that the federal arson statute's "jurisdictional hook as interpreted

17

in *Jones* serves the purpose of limiting the statute to arson cases where there really was a substantial and non-attenuated effect on interstate commerce" (citations and alterations omitted)). Therefore, the arson cases, like the Hobbs Act cases, establish that when Congress may regulate the commercial activities taking place in a building, it also can criminalize activities that interfere with those properties.[4]

Taken together, the Supreme Court's decisions in *Taylor*, *Russell*, *Jones*, and this Circuit's decisions in *Terry* and *Aman*, establish that when Congress may regulate an economic or commercial activity, it also may regulate violent conduct that interferes with or affects that activity. Hence, if individuals are engaged in ongoing economic or commercial activity subject to congressional regulation—as Tibbs was at the time of the assault—then Congress also may prohibit violent crime that interferes with or affects such individuals' ongoing economic or commercial activity, including the type of bias-motivated assaults proscribed by the Hate Crimes Act.[5]

---

[4] We also note that other circuits have upheld arson convictions with less direct connection to commercial activity than the assault at issue here. *See, e.g.*, *United States v. Craft*, 484 F.3d 922, 928 (7th Cir. 2007) (upholding a conviction for the arson of temporarily unoccupied rental properties because the properties had not been "permanently remove[d] . . . from the stream of commerce."); *United States v. Jimenez*, 256 F.3d 330, 334 (5th Cir. 2001) (upholding a conviction for the arson of a home office within a family home).

[5] The dissenting opinion maintains that because Section 249(a)(2)(B)(iv)(I) does not include the term "interstate," it "does not require that the class of activities the victim was engaged in substantially affect[] interstate commerce, nor does it limit the class of activities regulated to commerce over which Congress has the authority to regulate." *Post* at 49. This is incorrect. As *Raich* established, Congress may "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." 545 U.S. at 17 (citations omitted). To that end, the Hate Crimes (Continued)

18

Defendant does not dispute—apparently for the good reason that it is beyond dispute—that Congress enjoys the authority to regulate the underlying commercial activity Tibbs was engaged in at the time of the assault—the preparation of goods for sale and shipment across state lines. *See United States v. Darby*, 312 U.S. 100, 113 (1941) (noting that "the shipment of manufactured goods interstate is such [interstate] commerce"). Thus, upholding Defendant's conviction "requires no more than that we graft [the Supreme Court's] holding in [*Darby*] onto the commerce element of the [Hate Crimes] Act." *Taylor*, 136 S. Ct. at 2080. Because Tibbs' activity—preparing packages for interstate sale and shipment—"is unquestionably an economic activity . . . [i]t therefore follows as a simple matter of logic that a [defendant] who affects or attempts to affect even the intrastate" preparation of packages for interstate sale and shipment "affects or attempts to affect commerce over which the United States has jurisdiction." *Id*.

---

Act, as applied, permits the prosecution of an *intrastate* hate crime only when it interferes with the victim's ongoing commercial and economic activities—here, the preparation of packages for interstate sale and shipment. Contrary to the dissenting opinion's assertion, *post* at 49–50, in drafting the Hate Crime Act's interstate commerce jurisdictional elements, Congress invoked the "full scope of [its] Commerce Clause power" and drew the legislation to comport with *Lopez* and *Morrison*, which "set[] forth outer reaches of [Congress's] commerce power." H.R. Rep. No. 111–86, at 15. That power extends to intrastate violent conduct that interferes with commercial or economic activity over which Congress has regulatory power—here the interstate markets for labor and retail goods. Defendant's prosecution, therefore, falls squarely within Congress's authority to regulate intrastate activities when they interfere with interstate commerce that Congress may permissibly regulate. Accordingly, the dissenting opinion errs in concluding that the jury failed to convict Defendant of a crime with a "stated interstate or foreign commerce jurisdictional basis." *Post* at 49–50.

Here, the evidence introduced at trial provided a more-than-adequate basis for the jury to find that Tibbs' assault "interfered" with or "affected" Defendant's preparation of packages for interstate sale and shipment, and therefore "affect[ed] commerce over which the United States has jurisdiction." *Id.* At the time of the physical assault, Tibbs was pulling boxes and packaging them for interstate shipment. As a result of the assault, the packages prepared by Tibbs flew into the air and onto the ground. After the assault, Amazon closed the entire area where Tibbs and Defendant were working so that Tibbs's blood could be cleaned off the floor. And because of the assault, Tibbs missed the rest of his shift, and his work had to be absorbed by other facility employees.

That Amazon was able to absorb the impact of Tibbs' absence without missing any key shipping deadlines and that the fulfillment center's performance during the shift impacted by Tibbs' assault was in-line with its performance during other shifts does not call into question this determination. On the contrary, the Supreme Court and this Court repeatedly have clarified that Congress may regulate interference with commerce, even if the effect of the interference on interstate commerce in an individual case is "minimal." *See Taylor*, 136 S. Ct. at 2081 ("It makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal."). Put otherwise, when Congress may permissibly regulate a class of activities, the "courts have no power 'to excise, as trivial, individual instances' of the class." *Id.* (quoting *Perez v. United States*, 402 U.S. 146, 154 (1971).

Similarly, this Court has held that, in as-applied Commerce Clause challenges, "the relevant question . . . is not whether one particular offense has an impact on

20

interstate commerce, but whether the class of acts proscribed has such an impact." *United States v. Gibert*, 677 F.3d 613, 627 (4th Cir. 2012); *see also Terry*, 257 F.3d at 370 (affirming an arson conviction and holding that "[i]t is not dispositive that the commercial activity of providing daycare services took place entirely within the city of Raleigh"); *Aman*, 480 F. App'x at 225 (affirming an arson conviction even though the arson did not individually have a substantial effect on interstate commerce).

In essence, when a defendant interferes with economic or commercial activity—be it by robbing an individual or entity engaged in commercial activity, burning down a building used in commerce, battering an employee engaged in commercial activity, or some other manner—whether the defendant's conduct substantially affects interstate commerce is not measured against the scope of the commercial enterprise subject to interference. That is because Congress has no less authority to criminalize interference with economic or commercial activity at large enterprises like Amazon—which are more easily able to absorb productivity losses—than it does at sole proprietorships or "mom and pop" establishments with only a handful of employees—for which a 45-minute halt in activity could constitute a substantial loss. Indeed, *Taylor* establishes that Congress has the power to proscribe violent conduct even "when any actual or threatened effect on commerce in a particular case is minimal," 136 S. Ct. at 2081, regardless of whether the actual or threatened effect is to the business of a multi-national corporation or a local enterprise.

Accordingly, that Defendant's assault of Tibbs may have "minimal[ly]" impacted Amazon's business—and interstate commerce generally—does not render Defendant's

21

prosecution unconstitutional. *Id.* Rather, it is sufficient that Congress could reasonably determine that the aggregate effect of assaults on individuals engaged in ongoing economic or commercial activity—like Defendant's assault of Tibbs while he was preparing packages for interstate sale and shipment—amounts to a "substantial effect" on interstate commerce.[6] Just as *Taylor* concluded that the aggregate effect of marijuana robbery was sufficient to satisfy the Commerce Clause, even though the defendant stole only a single "marijuana cigarette," *id.* at 2078, so too the aggregate effect of assaulting workers preparing packages for interstate shipment satisfies the Commerce Clause, even though the immediate warehouse area where Tibbs was assaulted was closed for at most 45 minutes and Tibbs missed only a single shift.

## C.

Nevertheless, Defendant argues that his prosecution violates the Commerce Clause for four reasons: (1) his conduct did not "substantially affect" interstate commerce, as the Supreme Court construed that requirement in *Lopez* and *Morrison*; (2) robbery and arson, unlike bias-motivated assaults, are "inherently economic crimes"; (3) unlike robbery and arson, bias-motivated assaults do not "further an economic interest"; and (4) robbery and

---

[6] We also note that in "assessing the scope of Congress' Commerce Clause authority" under the Hate Crimes Act, we "need not determine whether [the regulated conduct], taken in the aggregate, substantially affect[s] interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Raich*, 545 U.S. at 22. We readily determine that a rational basis exists to conclude that bias-motivated assaults that interfere with ongoing commercial activity have a substantial effect on interstate commerce in the aggregate.

22

arson are crimes against "property," not crimes against persons. Appellee's Br. at 18–21. As explained below, none of these arguments is persuasive.

First, Defendant argues—and the district court held—that his assault of Tibbs does not fall under Congress's authority to regulate activities that "substantially affect" interstate commerce, as the Supreme Court construed that requirement in *Lopez* and *Morrison*. We disagree.

In *Lopez*, the Supreme Court considered a challenge to the Gun-Free School Zones Act, in which Congress established a federal criminal offense prohibiting possession of a firearm near a school. 514 U.S. at 551. There, the defendant, a twelfth-grade student, was charged with carrying a concealed .38-caliber handgun on school property. *Id.* The Supreme Court held that the statute exceeded Congress's authority under the Commerce Clause because it had "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561. The Court further emphasized that the statute lacked an interstate-commerce jurisdictional element and explained that it could not be "sustained under . . . cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* Finally, the Court rejected the Government's argument that the statute was constitutional because possession of firearms in school zones may lead to violent crimes which have substantial societal and economic costs. *Id.* at 563–64. Accepting such a "costs of crime" argument would permit Congress to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce," the

23

Court said, which would unconstitutionally "'obliterate the distinction between what is national and what is local.'" *Id.* at 564, 567 (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 554 (1935) (Cardozo, J., concurring)).

*Morrison* involved a challenge to a provision in the Violence Against Women Act, which established a federal civil remedy for the victims of gender-motivated violence. 529 U.S. at 601–02.  The Supreme Court held that the statute exceeded Congress's power under the Commerce Clause, emphasizing that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity."  *Id.* at 613.  "The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States," the Court explained.  *Id.* at 618.  The Court also emphasized that the Violence Against Women Act, like the Gun-Free School Zones Act, did not have an interstate-commerce jurisdictional element.  *Id.* at 613.  Finally, the Court rejected "the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."  *Id.* at 617; *see also id.* at 618 ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

For several reasons, *Lopez* and *Morrison* are readily distinguishable from Defendant's prosecution under the Hate Crimes Act.  To begin, whereas the *Lopez* and *Morrison* Courts found it significant that the statutes at issue had no interstate-commerce jurisdictional element, the provision in the Hate Crimes Act under which the jury

24

convicted Defendant expressly includes such an element. That element requires that, to convict a defendant under the Hate Crimes Act, both a court and a fact-finder must determine, in each case, that the defendant's conduct "interfere[d] with commercial or other economic activity in which the victim is engaged at the time of the conduct." 18 U.S.C. § 249(a)(2)(B)(iv)(I). Notably, Defendant has not identified any case—nor have we found any such case—in which a federal criminal statute including an interstate commerce jurisdictional element has been held to exceed Congress's authority under the Commerce Clause. *Cf. United States v. Coleman*, 675 F.3d 615, 620 (6th Cir. 2012) ("[W]e regard the presence of such a jurisdictional element [that ensures case-by-case analysis that the violation in question affects interstate commerce] as the touchstone of valid congressional use of its Commerce Clause powers to regulate non-commercial activity.").

Importantly, the Hate Crime Act's interstate commerce element precludes the Government from prosecuting all bias-motivated crimes, "regardless of how tenuously they relate to interstate commerce" based on the theory that such crimes, in the aggregate, may have substantial downstream effects on interstate commerce—in other words, the "costs of crime" approach rejected in *Lopez*, 514 U.S. at 564. Rather, the Hate Crimes Act authorizes prosecution of only those bias-motivated violent crimes that interfere with or otherwise affect ongoing economic or commercial activity, as the jury found Defendant's assault of Tibbs did here. Put differently, the Hate Crimes Act's interstate commerce element ensures that the statute regulates only *economic*, violent criminal

25

conduct, not the type of "*noneconomic*, violent criminal conduct" at issue in *Morrison*, 529 U.S at 617 (emphasis added).

The specific conduct at issue in *Lopez* and *Morrison* illustrates the meaningful constraint imposed by the Hate Crimes Act's interstate commerce element. The conduct giving rise to the prosecutions at issue in *Lopez* and *Morrison*—possessing a handgun on a school campus and domestic violence—did not, under the facts of those cases, interfere with ongoing interstate commerce or economic activity. By contrast, a jury found that Defendant's assault of Tibbs interfered with ongoing commercial activity by preventing Tibbs from continuing to prepare packages for interstate sale and shipment. The *Lopez* Court itself recognized this critical distinction, stating that "Congress is empowered to regulate and protect . . . persons or things in interstate commerce, *even though the threat may come only from intrastate activities*." 514 U.S. at 558 (emphasis added).

Additionally, the slippery-slope concern animating the *Lopez* Court's holding— that allowing Congress to regulate the possession of guns in school zones would give Congress unfettered authority to regulate wholly intrastate conduct traditionally subject to regulation by the States—is not present here. Section 249(a)(2)(B)(iv)(I) of the Hate Crimes Act authorizes federal prosecution of a hate crime *only* when the crime "interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct," which does not give the federal Government general license to punish crimes of violence motivated by discriminatory animus.

And contrary to the district court's reasoning, our conclusion that the Government lawfully prosecuted Defendant does not mean "Congress can regulate all workplace

26

conduct" or that it can intrude into private homes. J.A. 39. Rather, we hold that Defendant's prosecution complied with the Commerce Clause because his assault of Tibbs interfered with ongoing commercial activity. That holding in no way usurps the States' authority to regulate violent crimes—including hate crimes—unrelated to ongoing interstate commerce.

For example, if Defendant had assaulted Tibbs at a private residence while Tibbs was not engaged in activity related to interstate commerce, then Defendant would not be subject to prosecution under the Hate Crimes Act. Therefore, the Hate Crimes Act's jurisdictional element ensures, "through case-by-case inquiry," that federal charges will arise only where a defendant's conduct has "the requisite nexus with interstate commerce." *Lopez*, 514 U.S. at 561–62. Because conduct criminalized under the Hate Crimes Act necessarily "relates to an activity that has something to do with commerce or any sort of economic enterprise," *Gibert*, 677 F.3d at 624 (internal quotation marks omitted), the statute does not open the door to pervasive federal regulation of violent hate crimes.

Second, Defendant argues—and the district court agreed—that the Supreme Court's Hobbs Act and arson precedent is inapplicable because bias-motivated assaults, unlike robbery and arson, are not "inherently economic crimes." Appellee's Br. at 21. Defendant is correct that there is nothing "inherently" economic about bias-motivated assaults. But Defendant's argument rests on the incorrect premise that the *actus reus* proscribed by a federal criminal statute must be "inherently economic" in order for the statute to comply with the Commerce Clause. Contrary to Defendant's reasoning,

27

whether the application of a federal statute proscribing violent crime complies with the Commerce Clause does not turn on whether the act proscribed by the statute is "economic" or "non-economic." The Hobbs Act and the federal arson statute comply with the Commerce Clause when they proscribe conduct interfering with or affecting interstate commerce *not* because robbery and arson are "inherently economic," but rather because those statutes contain jurisdictional elements that limit the statutes' reach to those robberies and arsons that interfere with or affect interstate commerce. *See United States v. Carr*, 652 F.3d 811, 813 (7th Cir. 2011) ("Although *robbery itself is not necessarily economic activity*, [the defendant]'s crime targeted a business engaged in interstate commerce. And unlike the statutes at issue in *Lopez* and *Morrison*, the Hobbs Act contains a jurisdictional element which requires the Government to prove the interstate nexus." (emphasis added)); *United States v. Wang*, 222 F.3d 234, 238 (6th Cir. 2000) (reversing a Hobbs Act robbery conviction where the "criminal act [was] directed at a private citizen" and the "connection to interstate commerce [was] much more attenuated").

Recall that in the case of the arson statute, for example, the Supreme Court in *Jones* construed the statute to apply only to those properties "currently used in commerce or in an activity affecting commerce"—and not to private residences not used for commercial activity. 529 U.S. at 859; *see also United States v. Patton*, 451 F.3d 615, 633 (10th Cir. 2006) ("In *Jones,* therefore, the jurisdictional hook served the purpose of limiting the statute to arson cases where there really was a substantial and non-attenuated effect on interstate commerce."). If arson is "inherently economic" and therefore subject

28

to congressional regulation—as Defendant's argument presupposes—then *any* arson would fall under Congress's Commerce Clause authority.  But that is not the case.  *See, e.g.*, *United States v. Lamont*, 330 F.3d 1249, 1257 (9th Cir. 2003) (holding that the federal arson statute cannot ordinarily be applied to a church, "at least in the absence of some unusual connection to interstate commerce").

Defendant's economic/non-economic *actus reus* distinction also runs contrary to decisions by the Supreme Court, this Court, and other circuits regarding the constitutionality of federal laws proscribing the possession of firearms in certain locations or by certain classes of persons.  18 U.S.C. § 922 (q)(2)(A).  Emphasizing that the "possession" of a firearm is "*in no sense an economic activity* that might, through repetition elsewhere, substantially affect any sort of interstate commerce," the *Lopez* court struck down the first version of the Gun-Free School Zones statute.  514 U.S. at 567 (emphasis added).

Following *Lopez*, Congress reenacted the statute, this time with an interstate commerce element requiring that the Government prove the firearm at issue "has moved in or . . . otherwise affects interstate or foreign commerce."  18 U.S.C. § 922 (q)(2)(A).  Notably, numerous courts have concluded that Congress's addition of the interstate commerce element remedied the Commerce Clause problem identified in the earlier version of the statute.  *See United States v. Dorsey*, 418 F.3d 1038, 1045 (9th Cir. 2005) ("The *Lopez* decision did not alter this rule that a jurisdictional element will bring a federal criminal statute within Congress's power under the Commerce Clause."), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009); *United States v.*

29

*Danks*, 221 F.3d 1037, 1038 (8th Cir. 1999) (rejecting the argument that the "mere insertion of a 'commerce nexus' does not cure the original Act's defect").

Likewise, this Court—along with every other circuit to have considered the issue—has upheld other federal statutes criminalizing firearm *possession* when the firearm in question moved in interstate commerce*. See, e.g.*, *United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001); *see also United States v. Nathan*, 202 F.3d 230, 234 (4th Cir. 2000) (explaining that the jurisdictional element "requires a case-by-case inquiry into the connection with commerce"). Accordingly, notwithstanding that the actus reus in these firearms statutes—possession—is "in no sense an economic activity," *Lopez*, 514 U.S. at 567, this Court and other courts have concluded the interstate commerce element rendered the statute constitutional. What renders the Hobbs Act, the arson statute, and the firearm possession statutes—and, therefore, Defendant's prosecution of the Hate Crimes Act—constitutional is not the economic nature of the act proscribed, but rather Congress's express requirement that the act at issue, violent or otherwise, interfered with or affected interstate commerce.

The distinction Defendant would have us draw between "inherently economic" and non-economic acts also would lead to any number of anomalous results. For example, under Defendant's reasoning, the Commerce Clause would not permit federal authorities to prosecute an individual who—like Defendant—attacked a coworker engaged in the packing and shipment of a product across state lines. However, if that shipped product was a firearm and the recipient sat on a park bench within 1,000 feet of a public school while in possession of that firearm—be it the following day or seventeen

years later—the recipient's conduct would have a sufficient effect on interstate commerce to support the recipient's conviction under the Commerce Clause. *See United States v. Crump*, 120 F.3d 462, 466 n.2 (4th Cir. 1997); *see also United States v. Roseby*, 454 Fed. App'x 186, 188 (4th Cir. 2011). It can hardly be gainsaid that the possession of a firearm outside a school bears any more obvious a relationship to interstate commerce than interfering with the *actual shipment* of the same firearm across state lines.

Third, Defendant argues that Defendant's prosecution under the Hate Crimes Act differs from the Supreme Court's Hobbs Act and arson cases because Defendant did not assault Tibbs "in order to further an economic interest." Appellee Br. at 19. But the Supreme Court has recognized that the economic or non-economic nature of proscribed conduct turns on whether the conduct can be shown to *interfere with* or *affect* economic activity subject to congressional regulation—and therefore interstate commerce—and not whether the perpetrator of the conduct was *motivated* by economic interest. *See Jones*, 529 U.S. at 854 (requiring courts to consider the commercial function, if any, of destroyed property to determine whether its destruction may be prosecuted under the federal arson statute). That is why this Court consistently has rejected the argument that a defendant must intend for his criminal conduct to affect interstate commerce for such conduct to be susceptible to congressional regulation under the Commerce Clause. *See, e.g.*, *Williams*, 342 F.3d at 354 (holding that the Hobbs Act "does not require proof that a defendant intended to affect commerce or that the effect on commerce was certain; it is enough that such an effect was the natural, probable consequence of the defendant's actions").

31

For example, this Court and other circuits have concluded that federal arson statutes may be applied against defendants who set fire to property used in interstate commerce, notwithstanding that such defendants were motivated by purely personal reasons, and not any economic interest. *See, e.g.*, *United States v. Ballinger*, 395 F.3d 1218, 1223 (11th Cir. 2005) (en banc) (upholding the conviction of a defendant, a self-proclaimed practicing "Luciferian," who set fire to numerous churches because of his "hostility toward organized Christianity"); *United States v. Cristobal*, 293 F.3d 134, 137, 144–46 (4th Cir. 2002) (upholding a federal arson conviction where the defendant targeted victims based on suspicions regarding his wife's philandering and planted car bombs on vehicles driven by victims and owned by the victims' employers); *United States v. Grassie*, 237 F.3d 1199, 1205, 1211–12 (10th Cir. 2001) (upholding the conviction of the defendant who set fire to a truck used to haul fruits of annual harvest, even though the defendant set fire to the truck because the victim's mother had broken off a relationship with the defendant). Accordingly, that Defendant's assault of Tibbs was motivated by a non-economic interest did not render Defendant's prosecution unconstitutional because "the natural, probable consequence of the defendant's actions"—assaulting an individual engaged in packaging products for interstate shipment—interfered with ongoing commercial activity. *Williams*, 342 F.3d at 354.

Fourth, Defendant argues that his prosecution violated the Constitution because the Commerce Clause permits Congress to regulate only violent crimes against *property*, not crimes against *persons*. Under Defendant's reasoning, therefore, Congress could hold criminally accountable individuals who damage real property owned by a

32

business, *see Terry*, 257 F.3d at 369–71, but not individuals who assault an employee actively working for that business. Yet there is no constitutional or logical basis to conclude that the Commerce Clause authorizes Congress to regulate interference with one factor of production (capital, in the form of real property), but not another (labor). On the contrary, the Supreme Court's longstanding recognition that Congress may pervasively regulate the labor market and the terms and conditions of employment indicates that Congress may proscribe conduct that interferes with labor as well as capital. *See, e.g.*, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30–32 (1937) (rejecting Commerce Clause challenge to the National Labor Relations Act).

The fallacy underlying this distinction is even more evident in light of the rising tide of automation throughout much of the American economy. *See generally* Cynthia Estlund, *What Should We Do After Work? Automation and Employment Law*, 128 Yale L.J. 254, 258 (2018) (noting that "[r]obotic and digital production of goods and services, coupled with advances in AI and machine learning, is poised to take over both routine or repetitive tasks and some more advanced tasks"). Under the rule proposed by Defendant, Congress would have less authority to protect flesh-and-blood workers employed in interstate commerce than machines performing the very same tasks as those workers. We see no constitutional basis for embracing such a rule, and Defendant has pointed to none.

In sum, it is irrelevant that a bias-motivated "punch in the face" is non-economic, standing alone. Appellee's Br. at 22. It is not the violent *act* itself, or the motivation behind that act, that triggers Congress's regulatory authority under the Commerce Clause, but the *effect* of that act on interstate commerce that renders it susceptible to federal

33

regulation. Although "a jurisdictional hook is not . . . a talisman that wards off [all] constitutional challenges," the Hate Crimes Act's interstate commerce element ensures that each prosecution under the Hate Crimes Act will bear the necessary relationship to commerce that renders the crime within Congress's purview. *Patton*, 451 F.3d at 632.

III.

In the alternative, Defendant argues that the district court reversibly erred in refusing to give the jury Defendant's proposed instructions regarding the Hate Crime Act's interstate commerce element.[7] We review a district court's decision not to grant a particular jury instruction for abuse of discretion and review de novo whether a jury instruction incorrectly states the law. *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018). "A refusal to grant a requested instruction is only reversible error if the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Patterson*, 150 F.3d 382, 388 (4th Cir. 1998) (citations omitted).

Defendant asked the district court to instruct the jury that "in connection with the offense, the Defendant interfered with the commercial or other economic activity in

---

[7] The Government argues that Defendant's objection to the district court's charge is not properly before us because Defendant did not cross-appeal the judgment. *See JH ex rel. JD v. Henrico Cty. Sch. Bd.*, 326 F.3d 560, 567 n.5 (4th Cir. 2003). As the Government acknowledges, however, the cross-appeal rule is not jurisdictional, *Tug Raven v. Trexler*, 419 F.2d 536, 548 (4th Cir. 1969), and we may reach Defendant's objections in our discretion. Because Defendant's objection rests entirely on the merits of his constitutional challenge, judicial economy favors the exercise of our discretion here.

which [Tibbs] was engaged at the time of the conduct; and that the Defendant's conduct substantially affected interstate or foreign commerce." Appellee's Br. at 40; J.A. 138. According to Defendant's proposed instructions, for Defendant's conduct to have "substantially affected interstate . . . commerce," "the Government must prove that the violence caused a relatively significant disruption to commerce." Appellee's Br. at 40; J.A. 140. Rather than using Defendant's proposed instructions, the district court instructed the jury that, to convict, it had to find that Defendant's conduct "interfered with the commercial or economic activity in which Tibbs was engaged at the time of the conduct."[8] J.A. 541.

The district court did not reversibly err in refusing to give Defendant's proposed instructions as to the interstate commerce element. Defendant's requested instruction requiring the jury to find that his conduct "caused a *relatively significant* disruption to commerce" constituted an incorrect statement of law. As explained previously, the Supreme Court and this Court repeatedly have held that Congress may regulate interference with commerce, even if the effect of the interference on interstate commerce in an individual case is "minimal." *See supra* Part II.A (quoting *Taylor*, 136 S. Ct. at 2081); *see also, e.g.*, *Terry*, 257 F.3d at 367 (rejecting Commerce Clause challenge to

---

[8] 18 U.S.C. § 249 (a)(2)(B)(iv) requires that crimes prohibited in the Act (I) "interfere[] with commercial or other economic activity in which the victim is engaged at the time of the conduct; *or* (II) otherwise affect[] interstate or foreign commerce." *Id.* (emphasis added). Defendant was convicted under (I) but argues on appeal that the statute requires that both subclauses have a substantial effect on interstate commerce. But this position transforms the "or" separating the subclauses into an "and." We decline to distort the plain meaning of the statute.

federal arson statute as-applied to burning of a church even though the commercial activity at church—day care services—took place entirely within North Carolina). Because Defendant's proposed instruction was incorrect, the district court did not reversibly err in refusing to provide it. *See Miltier*, 882 F.3d at 89.

Rather than providing Defendant's errant instruction, the district court properly instructed the jury regarding the Hate Crimes Act's interstate commerce element in accordance with that provision's plain language. Accordingly, we reject Defendant's challenge to the district court's jury instructions.

IV.

In sum, the Hate Crimes Act as applied required the Government to prove beyond a reasonable doubt that Defendant's assault on Tibbs "interfere[d] with commercial or other economic activity in which the victim [was] engaged at the time of the conduct." 18 U.S.C. § 249(a)(2)(B)(iv)(I). The evidence introduced by the Government at trial provided the jury with a more-than-adequate basis to make such a finding.

In establishing that Congress has the authority to proscribe Defendant's assault of Tibbs, we simply follow the decisions of the Supreme Court and this Court regarding the constitutionality of prosecutions under the Hobbs Act and the federal arson statute. And there is no good reason to carve out a special exception to allow criminals who commit sexual orientation hate crimes under similar circumstances to avoid these well-established precedents.

Accordingly, we reverse the district court's judgment of acquittal and remand for reinstatement of the jury's guilty verdict.

36

*REVERSED AND REMANDED*

AGEE, Circuit Judge, dissenting:

Like the majority, I believe that the proper outcome in this case naturally flows from the Supreme Court's Commerce Clause precedent and the terms of 18 U.S.C. § 249(a)(2)(B)(iv)(I). Unlike the majority, I conclude that Congress' power under the Commerce Clause does not permit Hill's prosecution under that statute. This is so for two principal reasons. First, unlike the other provisions of § 249(a)(2)(B)—and, indeed, unlike "jurisdictional elements" in other statutes—§ 249(a)(2)(B)(iv)(I) does not limit the class of activities being regulated to acts that fall under Congress' Commerce Clause power. Second, the root activity § 249(a)(2) regulated in this case—a bias-motivated punch—is not an inherently economic activity and therefore not within the scope of Congress' Commerce Clause authority. For the reasons expounded below, I would affirm the district court's decision to vacate Hill's conviction and respectfully dissent.

I.

A.

The district court held that § 249(a)(2) was unconstitutional as applied to Hill in this case. I agree. And while my analysis of § 249(a)(2)(B)(iv)(I) would likely implicate other prosecutions brought under this particular provision, it is sufficient in this case to determine that the statute operated in a way that was unconstitutional as applied to Hill. *See Seling v. Young*, 531 U.S. 250, 271 (2001) ("[A]n 'as-applied' challenge is a claim that a statute, by its own terms, infringes constitutional freedoms in the circumstances of a particular case." (alterations, emphasis, and internal quotation marks omitted)).

38

B.

"[T]he Constitution creates a Federal Government of enumerated powers," reserving, among other functions, general police powers to the sovereign States. *United States v. Lopez*, 514 U.S. 549, 552 (1995). An enumerated power the Constitution specifically delegates to Congress is the ability to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. This case implicates Congress' power to regulate commerce "among the several States." *Id.* The Supreme Court has recognized that this power to regulate interstate commerce consists of "three broad categories": first, "the use of the channels of interstate commerce"; second, "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and third, "those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558–59 (citation omitted). This case involves only the third category: "activities that substantially affect interstate commerce." *Id.* at 559.

When "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute" does not deprive Congress of the ability to regulate that activity. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (quoting *Lopez*, 514 U.S. at 558). It follows from this principle that legislation regulating activities substantially affecting interstate commerce is deemed a proper exercise of Congress' Commerce Clause power even when the statute's scope regulates purely intrastate economic activity, *Lopez,* 514 U.S. at 559–60, but only so long as the regulated activities "are part of an economic 'class of activities' that have a substantial effect on

39

interstate commerce," *Raich*, 545 U.S. at 17; *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("[E]ven if [an] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce . . . ."). The Supreme Court has permitted such aggregation of individual instances to create the requisite substantial effect on interstate commerce "only where [the regulated] activity is economic in nature." *Taylor v. United States*, 136 S. Ct. 2074, 2079–80 (2016) (quoting *United States v. Morrison*, 529 U.S. 598, 613 (2000)).

In determining whether a statute substantially affects interstate commerce, the Supreme Court has looked to four factors: (1) Is the regulated activity inherently economic?; (2) Are there legislative findings that reveal why something that does not appear to substantially affect interstate commerce actually does so?; (3) Does the statute contain a jurisdictional element that limits the statute's reach to acts that "have an explicit connection with or effect on interstate commerce"?; and (4) Is the link between the regulated activity and interstate commerce attenuated? *Lopez*, 514 U.S. at 559–63; *see Morrison*, 529 U.S. at 610–17.

## II.

### A.

A distinguishing factor between this statute and those at issue in *Lopez* and *Morrison* is that § 249(a)(2)(B) includes a so-called "jurisdictional element" purporting to require a connection between the regulated activity—here, bias-motivated assaults—

40

and Congress' Commerce Clause power. In *Lopez* and *Morrison*, the Supreme Court held that the presence of a jurisdictional element "would ensure, through case-by-case inquiry, that the [activity being regulated] affects interstate commerce." *Lopez*, 514 U.S. at 561; *see also Morrison*, 529 U.S. at 611–13 (observing that the Violence Against Women Act "contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce"). To effectuate its intended purpose, a jurisdictional element must "limit [the statute's] reach to a discrete set of [activities being regulated] that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. Put another way, when a jurisdictional element is the sole basis for concluding that a particular statute is constitutional, it must independently accomplish what nothing else in the statute does: compel the Court to conclude that the activity being regulated falls within Congress' Commerce Clause power.

The Supreme Court ably described this relationship between the substantive and jurisdictional elements of an offense in *Torres v. Lynch*, 136 S. Ct. 1619 (2016):

> In our federal system, Congress cannot punish felonies generally; it may enact only those criminal laws that are connected to one of its constitutionally enumerated powers, such as the authority to regulate interstate commerce. As a result, most federal offenses include, in addition to substantive elements, a jurisdictional one . . . . The substantive elements primarily define the behavior that the statute calls a violation of federal law . . . . The jurisdictional element, by contrast, ties the substantive offense . . . to one of Congress's constitutional powers . . ., thus spelling out the warrant for Congress to legislate.

*Id.* at 1624 (alterations, citations, and internal quotation marks omitted).

41

Likewise, § 249(a)(2) contains both jurisdictional and substantive elements, requiring the Government to prove both that a person "willfully cause[d] bodily injury to any person . . . because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person," § 249(a)(2)(A), and one of the following:

> (i) the conduct described . . . occurs during the course of, or as the result of, the travel of the defendant or the victim—
> (I) *across a State line* or national border; or
> (II) *using a channel, facility, or instrumentality of interstate* or foreign *commerce*;
> (ii) the defendant *uses a channel, facility, or instrumentality of interstate* or foreign *commerce* in connection with the conduct described . . .;
> (iii) in connection with the conduct described . . ., the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other *weapon that has traveled in interstate* or foreign *commerce*; or
> (iv) the conduct described . . .—
> (I) interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or
> (II) otherwise *affects interstate* or foreign *commerce*.

§ 249(a)(2)(B) (emphases added). For purposes of Hill's prosecution, the Government charged that Hill

> willfully cause[d] bodily injury to C.T. by assaulting [him], including by punching C.T., because of C.T.'s actual and perceived sexual orientation . . .; and that, in connection with the offense, [Hill] interfered with commercial and other economic activity in which C.T. was engaged at the time of the conduct, and which offense otherwise affected interstate and foreign commerce.

J.A. 19; *Cf.* J.A. 21. For reasons known only to the Government, *it struck* the language charging Hill under § 249(a)(2)(B)(iv)(II), that Hill's offense "otherwise affected interstate . . . commerce," from the indictment. J.A. 21. Instead, the Government relied

solely on § 249(a)(2)(B)(iv)(I), the only provision in the statute with *no* nexus to interstate or foreign commerce.

As the above-emphasized language reflects, the text of § 249(a)(2)(B)(iv)(I) substantially differs from all of the other ways the Government can prove this element of the offense. The other subsections directly refer to "interstate" travel or commerce; further, they track the broad categories of activities the Supreme Court has identified as falling within Congress' power to regulate under the Commerce Clause. *Cf. Lopez*, 514 U.S. at 558–59 (identifying (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "activities that substantially affect interstate commerce"). Thus, the other subsections of the statute expressly incorporate within their text Congress' constitutional authority under the Commerce Clause.

In contrast, § 249(a)(2)(B)(iv)(I) is a distinct outlier without an interstate or foreign commerce statutory nexus. Nor is the unrestricted phrase "commercial or other economic activity" one of the categories the Supreme Court has identified as an area Congress can regulate under its Commerce Clause power. By § 249(a)(2)(B)(iv)(I)'s plain terms, it contains *no* jurisdictional nexus to Congress' authority under the Commerce Clause and thus fails under *Lopez* to be a "jurisdictional element" that has "an explicit connection with or effect on interstate commerce." *Id.* at 562. This textual difference is meaningful: as set out in the analysis that follows, § 249(a)(2)(B)(iv)(I) encompasses conduct that falls outside Congress' Commerce Clause authority.

In this regard, § 249(a)(2)(B)(iv)(I)'s text is unusual, if not unique, not just within

§ 249(a)(2)(B), but also within statutory language the Supreme Court and this Court have

analyze since *Lopez* and *Morrison*.[9] The plain text of those jurisdictional elements

---

[9] Given the unusual language used here and that this case is the first to address this provision of § 249(a)(2), it is of no consequence that no other cases have concluded that a federal statute with such a non-distinct jurisdictional element has exceeded Congress' Commerce Clause power. *See supra* [23–24].

What's more, regardless of how particular cases have turned out, circuit courts have uniformly recognized that the mere presence of a jurisdictional element is not dispositive to the Commerce Clause inquiry. *E.g.*, *United States v. Durham*, 902 F.3d 1180, 1212 (10th Cir. 2018) ("Although the presence of a jurisdictional element is neither necessary nor sufficient, it is certainly helpful in determining whether the prohibited activity has a substantial effect on [interstate] commerce." (internal quotation marks omitted)); *United States v. Alderman*, 565 F.3d 641, 648 (9th Cir. 2009) (acknowledging that "a jurisdictional hook is not always a talisman that wards off constitutional challenges" and concluding that the court must look to whether "the jurisdictional hook *together with additional factors, such as congressional findings*" demonstrate a substantial effect on interstate commerce (emphasis added) (internal quotation marks omitted)), *cert. denied*, 562 U.S. 163 (2011); *United States v. Morales-de Jesus*, 372 F.3d 6, 13 (1st Cir. 2004) ("Although [a statute's] jurisdictional element ensures that any prosecuted conduct has a minimal nexus with interstate commerce, that minimal nexus may not meet the substantial effect requirement of *Morrison*."); *Norton v. Ashcroft*, 298 F.3d 547, 557 (6th Cir. 2002) ("[A] jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce. By the same measure, a jurisdictional element does not guarantee that a particular enactment will pass muster." (citations and internal quotation marks omitted)); *United States v. Rodia*, 194 F.3d 465, 472 (3d Cir. 1999) ("A hard and fast rule that the presence of a jurisdictional element automatically ensures the constitutionality of a statute ignores the fact that the connection between the activity regulated and the jurisdictional hook may be so attenuated as to fail to guarantee that the activity regulated has a substantial effect on interstate commerce."); *United States v. Wilson*, 73 F.3d 675, 685 (7th Cir. 1995) ("In discussing the lack of a jurisdictional element in *Lopez*, the [Supreme] Court simply did not state or imply that all criminal statutes must have such an element, or that all statutes with such an element would be constitutional . . . ."). And even the outlier circuit court that indicated the presence of a jurisdictional element *is* dispositive was referring to a provision in 18 U.S.C. § 922(g) that the court concluded performed its necessary role of ensuring that all prosecutions under the provision fell within Congress' Commerce Clause power. *See United States v. Cunningham*, 161 F.3d 1343, 1346 (11th Cir. 1998) (Continued)

44

differs fundamentally from the provision at issue in this case because they—like the other subsections of § 249(a)(2)(B)—use language directly implicating Congress' authority to regulate interstate commerce. For example, in *Jones v. United States*, 529 U.S. 848 (2000), and *Russell v. United States*, 471 U.S. 858 (1985), the Supreme Court considered the scope of the federal arson statute, which prohibits damaging or destroying (or their attempt), "by means of fire or an explosive, any . . . property *used in interstate* or foreign *commerce* or in any activity *affecting interstate* or foreign *commerce*," 18 U.S.C. § 844(i) (emphases added). And in *Taylor*, 136 S. Ct. 2074, the Supreme Court reviewed the Hobbs Act, in which Congress described the jurisdictional element as the requirement of having "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce," 18 U.S.C. § 1951(a). Significantly, though, Congress defined "commerce" for purposes of the Hobbs Act to mean interstate commerce and "all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3). Read together, these two provisions in the Hobbs Act ensured that any finding as to the jurisdictional element also satisfied Congress' Commerce Clause power. *Taylor*, 136 S. Ct. at 2079–80; *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (analyzing the Federal Arbitration Act, which applies to "contract[s] evidencing a transaction *involving commerce*," 9 U.S.C. § 2 (emphasis added), and defines

_____

("[A] statute regulating noneconomic activity *necessarily satisfies Lopez* if it includes a jurisdictional element which would ensure, through case-by-case inquiry, that the defendant's particular offense affects interstate commerce." (emphasis in original) (citations and internal quotation marks omitted)).

"commerce" to mean, in relevant part, "commerce *among the several States*," 9 U.S.C. § 1 (emphasis added), as "words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power").

Similarly, this Circuit's cases examining whether a jurisdictional element has ensured that individual prosecutions fall within Congress' Commerce Clause power—regardless of any other factors that also did so—have all addressed statutory language directly connecting the element to Congress' constitutional authority. *E.g.*, *United States v. Umana*, 750 F.3d 320, 336 (4th Cir. 2014) (examining murder in aid of racketeering, which requires a finding that an enterprise "engaged *in*, *or* the activities of which *affect*, *interstate* or foreign *commerce*" (emphases added) (quoting 18 U.S.C. § 1959(b)(2))); *United States v. Gibert*, 677 F.3d 613, 625–26 (4th Cir. 2012) (examining the federal prohibition on animal fighting, which includes the requirement that the venture was "*in or affecting interstate* or foreign *commerce*" (emphases added) (quoting 7 U.S.C. § 2156(g)(1)); *United States v. Gould*, 568 F.3d 459, 470–72 (4th Cir. 2009) (rejecting Commerce Clause challenge to the Sex Offender Registration and Notification Act in part because it contains the jurisdictional element of requiring that the defendant either have a prior federal sex offense *or* "travel[ ] *in interstate* or foreign *commerce*," 18 U.S.C. § 2250(a) (emphases added)); *United States v. Buculei*, 262 F.3d 322, 329 (4th Cir. 2001) (observing that 18 U.S.C. § 2251 contained a jurisdictional element as contemplated in *Lopez* because it required the jury to find that the defendant "knows or has reason to know that [the child pornography at issue] will be transported in *interstate* or foreign *commerce or mailed*" (emphasis added) (quoting 18 U.S.C. § 2251(a))); *United States v.*

46

*Cobb*, 144 F.3d 319, 321–22 (4th Cir. 1998) (holding, in relevant part, that the federal carjacking offense was "a valid exercise of Congress' authority under the Commerce Clause" because an element of the offense was taking of motor vehicles that had been "transported, shipped, or received *in interstate* or foreign *commerce*," 18 U.S.C. § 2119 (emphases added)).[10]

---

[10] The federal offense of possession of a firearm or ammunition by a convicted felon, 18 U.S.C. § 922(g), contains a jurisdictional element requiring proof that the defendant "possess[ed] in or affecting commerce, any firearm or ammunition," a phrase unmodified by the word "interstate." *Id.* Of course, most convictions for this offense rely on a different jurisdictional element given that the Government can also show "that the firearm traveled in interstate commerce at some point." *United States v. Hobbs*, 136 F.3d 384, 390 (4th Cir. 1998). In any event, we have held that this commerce provision is a valid exercise of Congress' Commerce Clause authority because it "requir[es] the Government to show that a nexus exists between the firearm and *interstate* commerce." *United States v. Wells*, 98 F.3d 808, 811 (4th Cir. 1996) (emphasis added). Our analysis relied in part on *Scarborough v. United States*, 431 U.S. 563 (1977), in which the Supreme Court analyzed the predecessor statute to 18 U.S.C. § 922(g) and held that Congress' prohibition of firearm possession "in commerce or affecting commerce" indicated its intent to regulate to the full scope of its power under the Commerce Clause. *Scarborough*, 431 U.S. at 567, 575; *see also United States v. Pierson*, 139 F.3d 501, 503 (5th Cir. 1998) ("The words 'affecting commerce' are jurisdictional words of art, typically signaling a congressional intent to exercise its Commerce Clause power broadly, perhaps as far as the Constitution permits." (alteration and internal quotation marks omitted)). While some tension exists between *Scarborough* and the Supreme Court's decision in *Lopez*, the Supreme Court has not granted certiorari on a case that would provide further guidance, *see Alderman*, 562 U.S. 1163 (mem.) (Thomas, J., dissenting from the denial of certiorari) (discussing this conflict), and circuit courts have routinely relied on *Scarborough* as a basis for distinguishing *Lopez* in the context of firearms-related offenses.

But Congress did not use these jurisdictional words of art in § 249(a)(2)(B)(iv)(I), so this case does not require any reconciliation of *Scarborough* and *Lopez*. *See, e.g.*, *Jones*, 529 U.S. at 854 (rejecting the Government's argument that the federal arson statute similarly indicated Congress' intent "to invoke its full authority under the Commerce Clause" because it "contains the qualifying words 'used in' a commerce-affecting activity," thus indicating that the crime is not arson of a building "whose damage or destruction might affect interstate commerce," but rather that the "destroyed (Continued)

No such corollary exists in § 249(a)(2)(B)(iv)(I): it does not require that the class of the victim's activities affected interstate commerce, nor does it limit the class of regulated activities to commerce over which Congress has authority. Contrary to the majority's holding, Congress cannot regulate all "commercial or other economic activity" in which a victim is engaged because Congress cannot generally regulate all commercial and economic activities based on an unsubstantiated assumption that they will—at some level of abstraction—affect interstate commerce. *Lopez*, 514 U.S. at 559 (holding that "in order to be within Congress' power to regulate it under the Commerce Clause," an activity must "substantially affect," and not just "affect," interstate commerce); *see also Raich*, 545 U.S. at 22. Simply put, that the regulated activity interfered with someone else's "commercial" or "economic" activity is insufficient, else *Lopez*'s third category of Commerce Clause power would have no meaning. Indeed, the Supreme Court has expressly and repeatedly cautioned against conflating regular commerce and commerce over which Congress has authority:

> [T]he scope of the interstate commerce power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.

*Lopez*, 514 U.S. at 557 (internal quotation marks omitted).

---

property must itself have been used in commerce or in an activity affecting commerce," requiring a two-step analysis, first "into the function of the building itself, and then [into] whether that function affects interstate commerce").

48

Section 249(a)(2)(B)(iv)(I) does not ensure that prosecutions under it are "sufficiently tied to interstate commerce [as opposed to regulating] a wider, and more purely intrastate, body of violent crime." *Morrison*, 529 U.S. at 613; *see Lopez*, 514 U.S. at 562 (describing the requisite jurisdictional element as "limit[ing] [the statute's] reach to a discrete set of [regulated activities] that additionally *have an explicit connection with or effect on interstate commerce*" (emphasis added)).

In sum, § 249(a)(2)(B)(iv)(I) does not require that the class of activities the victim was engaged in substantially affected interstate commerce, nor does it limit the class of activities regulated to commerce over which Congress has the authority to regulate. As such, it does not do what it must do to "limit [the statute's] reach to a discrete set of [acts] that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. Therefore, § 249(a)(2)(B)(iv)(I) is not properly labeled a "jurisdictional element" in the sense that *Lopez* and *Morrison* described as the means of "ensur[ing], through case-by-case inquiry, that the [activity] in question affects interstate commerce." *Id.* at 561.

Applying this principle here, because § 249(a)(2)(B)(iv)(I) is not coextensive with Congress' Commerce Clause power, the jury's finding that Hill's conduct satisfied this element of the offense did not demonstrate that Hill's conduct is within the reach of Congress' constitutional authority. In short, Hill was not charged with (or later convicted

of) a crime with a stated interstate or foreign commerce jurisdictional basis.[11] The practical consequence of this conclusion is that a prosecution under § 249(a)(2)(B)(iv)(I) is a prosecution for an offense that does not have a constitutionally valid jurisdictional element, just as the statutes at issue in *Lopez* and *Morrison* were similarly flawed.

B.

1.

To be a valid exercise of Congress' *Commerce* Clause authority, the regulated activity must have a substantial effect on interstate *commerce*. One way a statute can do so is if the activity being regulated is economic in nature. Put another way, certain functions can be clearly economic in nature so that a jurisdictional element is not necessary to ensure that the activity being regulated falls within Congress' Commerce Clause power. *United States v. Forrest*, 429 F.3d 73, 77 n.1 (4th Cir. 2005) ("[A]n effective jurisdictional element is certainly not required where . . . the statute directly regulates economic activity.").

When undertaking this review, *Lopez* and *Morrison* direct courts to look at the root activity being regulated without regard for the jurisdictional element. The statutes at issue in both of those cases lacked jurisdictional elements, and when discussing the factors to be considered in determining whether the statutes were valid exercises of Congress' Commerce Clause power, the Supreme Court repeatedly cited the

---

[11] As noted, the Government here affirmatively *eliminated* language representing an interstate or foreign commerce jurisdictional nexus by striking the language of § 249(a)(2)(B)(iv)(II) from the indictment and charging Hill under § 249(a)(2)(B)(iv)(I) alone.

noneconomic nature of the root activity regulated and then separately indicated that the presence of a jurisdictional element might be a distinct ground for concluding a statute regulating noneconomic activity could nonetheless be constitutional. *E.g.*, *Lopez*, 514 U.S. at 561 (holding that knowing possession of a firearm in a school zone "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms" and then "[s]econd" in its analysis observing that the statute "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce"); *accord* *Morrison*, 529 U.S. at 613 (observing first that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity" and then separately observing that the statute "contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce"). While the inclusion of a proper jurisdictional element may ensure that the application of Congress' regulation of the activity is a proper exercise of its Commerce Clause power, that is a distinct question from considering whether the underlying activity being regulated is economic or noneconomic in nature.

Subsequent Supreme Court and Fourth Circuit cases have followed *Lopez* and *Morrison*, keeping separate the inquiry into the economic nature of the root activity being regulated from the inquiry into the jurisdictional element's effect on the statute's constitutionality. This understanding is consistent with the Supreme Court's description in *Torres* that the "substantive elements [of a federal offense] primarily define the behavior that the statute calls a violation of federal law," while the "jurisdictional

51

element . . . ties [that] offense . . . to one of Congress's constitutional powers." 136 S. Ct. at 1624 (alterations and internal quotation marks omitted). And that view has been implemented in cases like *Raich*, where the Supreme Court upheld the Controlled Substances Act ("CSA") based on the CSA being a comprehensive regulation of an economic activity—the drug market—without reference to the Act's jurisdictional element. 545 U.S. at 25 ("[T]he activities regulated by the CSA are quintessentially economic."). And in *Jones*, when considering what the federal arson statute's jurisdictional element must mean so that a prosecution may be a valid exercise of Congress' Commerce Clause power, the Supreme Court operated from the premise—though did not explicit decide—that arson as a root activity could not be regulated absent that element. 529 U.S. at 850–59; *see Russell*, 471 U.S. at 858–62. Similarly, cases from this Circuit have considered separately whether the root activity being regulated was economic or noneconomic from whether the jurisdictional element would ensure the statute's constitutionality. *E.g.*, *Umana*, 750 F.3d at 336–38; *Gibert*, 677 F.3d at 624–27.

In enacting 18 U.S.C. § 249(a)(2), Congress sought to regulate "hate crimes" by prohibiting: "willfully caus[ing] bodily injury to any person" or attempting to do so through various described means "because of the actual or perceived" protected characteristics of the victim. § 249(a)(2). Put another way, the activity being regulated is the substantive offense of "willfully caus[ing] bodily injury" to another person based on a protected characteristic. *Id.* While the jurisdictional basis for Congress' regulation of that activity is an element of the offense, it is not part of the activity being regulated. It simply

52

ties the substantive offense to Congress' Commerce Clause power. *See Torres*, 136 S. Ct. at 1624.

The first and third subsections of § 249(a), which regulate the same root activity as § 249(a)(2), confirm this understanding of what Congress is regulating in this statute. Subsection (a)(1) prohibits "willfully caus[ing] bodily injury to any person" or attempting to do so through various described means "because of the actual or perceived" protected characteristics of the victim. § 249(a)(1). The only difference in the two substantive offenses under § 249(a)(1) and (2) is the covered protected characteristics of the victim. That difference is tied to Congress' stated constitutional grounds for enacting the two separate statutory provisions: Congress cited its authority under the Thirteenth Amendment to enact subsection (a)(1), and the protected characteristics of the victim purportedly relate back to that authority ("race, color, religion, or national origin"), while it cited its authority under the Commerce Clause to enact subsection (a)(2), where the protected characteristics of the victim are not so restricted. *See* Matthew Shepard & James Byrd, Jr. Hate Crimes Prevention Act, Pub. L. No. 111–84, Div. E., § 4702, 123 Stat. 2190, 2836 (2009); *see also United States v. Cannon*, 750 F.3d 492, 497–505 (5th Cir. 2014) (discussing Congress' authority to enact legislation eliminating the badges and incidents of slavery under the Thirteenth Amendment, and holding § 249(a)(1) to be a constitutional exercise of Congress' authority); *United States v. Hatch*, 722 F.3d 1193, 1196–1206 (10th Cir. 2013) (same); *United States v. Maybee*, 687 F.3d 1026, 1030–31 (8th Cir. 2012) (same). For this reason, too, subsection (a)(1) does not have a jurisdictional element akin to subsection (a)(2)(B). Similarly, subsection (a)(3) prohibits

53

the same conduct described in subsection (a)(1) and (a)(2)(A) if that root regulated activity occurred "within the special maritime or territorial jurisdiction of the United States." § 249(a)(3). By connecting the same root regulated activity to a different jurisdictional element, Congress sought to ensure that offenses brought under subsection (a)(3) were also within its enumerated powers to regulate. *See* U.S. Const. Art. I, § 8, cl. 10, 17; 18 U.S.C. § 7. In sum, in enacting § 249(a), Congress plainly intended to regulate certain "hate crimes," by criminalizing the willful infliction of bodily injury based on certain protected characteristics but through distinctively separate jurisdictional grounds of authority.

But the root activity § 249(a)(2) regulates is simply a subcategory of all assaults, conduct that has no discernible connection to commercial or economic activity of any sort, let alone the interstate variety.[12] *See Morrison*, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity."); *see also Bond v. United States*, 572 U.S. 844, 863 (2014) (rejecting an argument that a federal statute "reach[ed] the simplest of assaults" because that would "intrude upon the police power of the States" to regulate "traditionally local criminal conduct"); *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 903 (4th Cir. 1999) (en banc) (Niemeyer, J., concurring), *aff'd sub nom. Morrison*, 529 U.S. at 598 ("Because the general police power is recognized to include the right of the States to promote the public health, safety,

---

[12] In prosecuting Hill under § 249(a)(2)(B)(iv)(I), the Government sought to punish him for the specific act of punching a co-worker because of that co-worker's actual or perceived sexual orientation, which is also simply a subset of all assaults.

54

welfare, and morals of the State, it is not disputed that redress for assault . . . traditionally falls within the States' police power." (citation omitted)). Nor is § 249(a)(2) part of a comprehensive scheme, such that regulation of both interstate and intrastate activities is necessary to ensure that an interstate market is effectively regulated. *See Lopez*, 514 U.S. at 561 (observing that the possession of a firearm offense was not "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated").

It's also worth noting here that although the majority frames its analysis of § 249(a)(2)'s regulated activity to include the statute's jurisdictional element, they agree with the clear basic premise that "there is nothing 'inherently' economic about bias-motivated assaults." *Ante* at 27. Moreover, nothing in its subsequent discussion of the Supreme Court's cases conflicts with this fundamental understanding that certain acts—infliction of bodily injury being one of them—are not inherently economic activities and thus cannot be regulated absent some other means of connecting the activity to Congress' Commerce Clause power. Therefore, the majority erred in failing to separate § 249(a)(2)'s root activity from the jurisdictional element for this inquiry, which led to its equally erroneous designation of this statute as an economic regulation as opposed to a noneconomic one: one that thus fails to fall within Congress' Commerce Clause authority.

2.

Given its centrality to the majority's analysis, a brief discussion regarding the Supreme Court's decision in *Taylor* is warranted. The majority vastly overreads *Taylor* as

55

a basis for concluding that Congress has power under the Commerce Clause to regulate the range of commercial and economic activity that § 249(a)(2)(B)(iv)(I) encompasses.

The Supreme Court explicitly limited its holding in *Taylor* to Hobbs Act robberies in which a defendant targets drugs or drug proceeds; it did not purport to address the Government's burden for proving the jurisdictional element in other Hobbs Act cases, let alone its burden of proof for the jurisdictional element of other statutes. I take the Supreme Court at its word. *See Taylor*, 136 S. Ct. at 2082 ("Our holding today is limited to cases in which the defendant targets drug dealers for the purpose of stealing drugs or drug proceeds. We do not resolve what the Government must prove to establish Hobbs Act robbery where some other type of business or victim is targeted."). This limitation was directed squarely at Justice Thomas' dissenting opinion, which cautioned that the majority's "reasoning allows for unbounded regulation" akin to a general police power. *Id.* at 2087 (Thomas, J., dissenting). Justice Thomas' concerns have been borne out today, as the majority has construed Congress' authority under the Commerce Clause to authorize prosecutions under a purported jurisdictional element requiring no nexus to interstate commerce.

In addition, the majority overlooks that *Taylor*—and *Raich*—addressed a different aspect of Congress' authority to regulate under the Commerce Clause than what is at issue in this case. Those cases specifically involved purely intrastate activities that can be regulated as part of the comprehensive regulation of an interstate economic market. There is no such market here.

The analysis and result in *Taylor* flowed directly from the Court's analysis in *Raich*. *Id.* at 2081 ("[O]ur decision in *Raich* controls the outcome here. As long as Congress may regulate the purely intrastate possession and sale of illegal drugs, Congress may criminalize the theft or attempted theft of those same drugs."). In *Raich*, the Supreme Court considered the constitutionality of the CSA, a comprehensive regulatory scheme directed at an entire economic market. 545 U.S. at 5. Prohibiting regulation of purely intrastate applications of the CSA could leave "a gaping [enforcement] hole" that would undermine Congress' ability to effectively regulate the underlying economic activity of the interstate drug market. *Id.* at 22. But *Raich*'s holding was limited to that context, which is inapplicable to the purely noneconomic, stand-alone statute in this case.

As the district court recognized, "[u]nlike the CSA, [§ 249(a)(2)(B)(iv)(I)] does not regulate a commercial interstate market." *United States v. Hill*, No. 3:16-cr-00009-JAG, 2018 WL 3872315, at *6 n.6 (E.D. Va. Aug. 15, 2018). Instead, it falls on "the opposite end of the regulatory spectrum" from the CSA, which was at issue in *Raich*, and is instead the sort of "brief, single-subject statute" that was at issue in *Lopez* and *Morrison*. *Raich*, 545 U.S. at 23–24. *Raich* distinguished Congress' ability to regulate intrastate commerce as part of comprehensive commercial market regulation from the sort of statute at issue in *Lopez*. In doing so, the Court followed the same reasoning it had used in *Lopez*, as both cases reiterated statutes that are not "an essential part of a larger regulation of economic activity" cannot "be sustained under [Supreme Court] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce."

57

*Lopez*, 514 U.S. at 561; *accord Raich*, 545 U.S. at 24. *Taylor*, in turn, merely "graft[ed] [the] holding in *Raich* onto the commerce element of the Hobbs Act," without considering directly what the Commerce Clause would require of the Act's jurisdictional element in cases not involving robberies of "drug dealers for the purpose of stealing drugs or drug proceeds." *Taylor*, 136 S. Ct. at 2080, 2082. Consequently, it is error to apply the principles governing when such comprehensive regulatory schemes are a valid exercise of Congress' Commerce Clause power to the question of whether § 249(a)(2)(B)(iv)(I) is a valid exercise of that power.

In sum, § 249(a)(2)(B)(iv)(I) cannot be sustained under *Taylor* and *Raich* (or the earlier regulatory cases *Lopez* had distinguished) because all those cases involved the regulation of purely intrastate activities that, as a necessary part of regulation of interstate activities, plainly fell within Congress' Commerce Clause power. *See Lopez*, 514 U.S. at 558. In holding otherwise, the majority divorces *Raich* and *Taylor* from their necessary jurisprudential underpinnings. As a consequence, the majority wrongly construes *Taylor* to read Congress' authority under the Commerce Clause as the unrestricted power to regulate all interference with individuals engaged in any ongoing commercial or economic activity.

3.

As discussed in detail earlier, when examining whether prosecutions under § 249(a)(2)(B)(iv)(I) are sufficiently connected to interstate commerce to satisfy the Constitution, the noneconomic nature of the root activity regulated by § 249(a)(2) prohibits the Government from aggregating all bias-motivated assaults interfering with a

58

victim's commercial or economic activity to satisfy its burden to show that Hill's prosecution has the requisite nexus to Congress' power under the Commerce Clause.[13] As the Court recognized in *Morrison*, while it "need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history [its] cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." 529 U.S. at 613; *accord Taylor*, 136 S. Ct. at 2079–80 (reiterating and adhering to this principle). Because the root activity the provision regulates is noneconomic, the Government cannot aggregate its effects to satisfy the Commerce Clause's requirements.

The reasons behind this constraining principle are simple: otherwise, Congress' Commerce Clause power would be limitless. The Supreme Court has "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Morrison*, 529 U.S. at 617. This is so, in large part, because at some level of generality and aggregation, all crime can be construed to affect commerce. *See Lopez*, 514 U.S. at 563–64 (rejecting the Government's argument that the costs of violent crime affect the national economy because that would allow Congress to regulate "not only all violent crime, but all

---

[13] Where a valid jurisdictional element exists, such that a "class of activities is regulated *and that class is within the reach of federal power*, the courts have no power to excise, as trivial, individual instances of the class." *Perez v. United States*, 402 U.S. 146, 154 (1971) (emphasis added) (internal quotation marks omitted); *see also Taylor*, 136 S. Ct. at 2081. But that's not the case here, where prosecutions brought under § 249(a)(2)(B)(iv)(I) are not, as a class, activities Congress can regulate under its Commerce Clause power.

activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce"). Such a view would eliminate the necessary "distinction between what is truly national and what is truly local." *Morrison*, 529 U.S. at 617–18. As the Court explained:

> The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

*Id.* at 618 (citation omitted); *see also Lopez*, 514 U.S. at 564–65; *Brzonkala*, 169 F.3d at 839–40 ("*Lopez* clearly forecloses [looking to the aggregate effects of entire classes of activities] to sustain congressional regulation of *noneconomic* activities . . . . To extend such reasoning beyond the context of statutes regulating economic activities and uphold a statute regulating noneconomic activity merely because that activity, in the aggregate, has an attenuated, though real, effect on the economy, and therefore presumably on interstate commerce, would be effectively to remove all limits on federal authority, and to render unto Congress a police power impermissible under our Constitution." (citations omitted)).[14]

---

[14] The majority sidesteps this federalism mandate by observing that before the Government can prosecute a defendant under § 249(a)(2), the Attorney General must certify that the prosecution "is in the public interest and necessary to secure substantial justice." 18 U.S.C. § 249(b)(1)(D). It also notes that Virginia prosecutors contacted federal law enforcement to request federal prosecution because Virginia's statutes do not enhance the penalties if an offense is motivated by the victim's sexual orientation. Both points are red herrings. Neither the Executive Branch's view nor a state prosecutor's zeal can overcome the Constitution's grant of limited and enumerated powers to the federal (Continued)

Hill's prosecution is a prime example of the Supreme Court's concern that aggregating noneconomic crimes to arrive at the requisite connection to interstate commerce would render the Commerce Clause meaningless and indistinguishable from the constitutional defects in *Lopez* and *Morrison*. Hill's punch had no discernible impact on any commercial or economic activity scheduled to occur that day. Other workers at the distribution center absorbed the men's work, leading two witnesses to testify Hill's assault had no commercial impact whatsoever, let alone any effect on interstate commerce. First, Gina Serafini, an Amazon assistant manager, testified that the assault did not result in any missed critical pull times, or otherwise affect the ability to meet those times, which indicate that packages were shipped in the time Amazon had promised delivery. J.A. 420, 429. Second, expert witness Dr. Jonathan Whitaker testified that, based on his review of Amazon's shift performance statistics for the distribution center, "Amazon's financial and operational performance on that shift [during which the assault occurred] was no different than any other shift."[15] J.A. 448, 457–58.

To allow Congress to exercise its Commerce Clause power over the noneconomic offense of a bias-motived punch would allow Congress to exercise its Commerce Clause

government. It is the Court's responsibility to ensure that Congress has not overreached in enacting § 249(a)(2)(B)(iv)(I) and that the Government has not overreached by prosecuting a defendant under this provision when doing so would exceed Congress' Commerce Clause power.

[15] Specifically, he reported that Amazon's records showed that the distribution center shipped 99.9931% of their packages on time during the shift in which the assault occurred, which was comparable to both the next shift (99.9932%) and the "average for all the shifts during May for that facility" (99.9939%). J.A. 458–59.

power based on such indirect—and often, as here, non-existent—connection to commerce that it converts the Clause into a federal police power. Certainly, "congressional power under the Commerce Clause is necessarily one of degree." *Lopez*, 514 U.S. at 566 (internal quotation marks omitted). But at the same time, the Supreme Court has recognized that some attempts to regulate activities affecting commerce are too remote to be justified under the Commerce Clause:

> There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.

*Id.* at 567 (internal quotation marks omitted) (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 554 (1935) (Cardozo, J., concurring)). Hill's prosecution under § 249(a)(2)(B)(iv)(I) is such a case.

I agree with the district court's conclusion that allowing Hill's conviction to stand would mean that § 249(a)(2)(B)(iv)(I)'s scope "would barely have an end, as [it] could cover any conduct that occurs anywhere, as long as the government can show that the victim was 'engaged' in some sort of economic activity." *Hill*, 2018 WL 3872315, at *9. This unauthorized Commerce Clause expansion would result in a host of problems including the federalization of commercial property, the regulation of all aspects of employment and workplace conduct, and even the home, should individuals be engaged

in work while there.[16] That "cast[s] a very large shadow, indeed, and very little activity would remain in the exclusive province of the police powers of the state." *Id.* (alterations and internal quotation marks omitted). In sum, § 249(a)(2)(B)(iv)(I) regulates noneconomic activity that cannot be aggregated to arrive at the requisite substantial effect on interstate commerce to establish that it is a valid exercise of Congress' Commerce Clause power.

## C.

Although legislative findings are not required in order to conclude that a statute has a substantial effect on interstate commerce, the Supreme Court has repeatedly recognized that such findings are relevant and often useful to a Commerce Clause inquiry. *Lopez*, 514 U.S. at 563. In particular, legislative findings may allow courts to identify a substantial effect that is not "visible to the naked eye." *Id.* But because whether a particular regulation sufficiently affects interstate commerce remains a question of law for courts to decide, the mere existence of legislative findings containing Congress' view on the matter is not dispositive. As the district court succinctly observed: "Just because Congress says something is so does not make it so." *Hill*, 2018 WL 3872315, at *7; *accord Morrison*, 529 U.S. at 614 ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it

---

[16] While the majority purports to reject the view that § 249(a)(2)(B)(iv)(I) could be applied wherever an individual is at work, it offers no limiting principle for why interfering with an employee's work would not always qualify as interfering with "commercial or other economic activity," whether it's her own activities as an employee or her employer's activities as a member of the national market.

so." (alteration in original) (quoting *Lopez*, 514 U.S. at 557 n.2). Instead, courts look to whether the findings demonstrate the requisite connection to interstate commerce that the Constitution demands. *Morrison*, 529 U.S. at 614–15.

The Government cannot rely on the legislative findings underpinning § 249(a)(2) any more than it could in *Morrison*. Allowing the requisite link to be established by such generic boilerplate would, "[i]f accepted, . . . allow Congress to regulate any crime." *Id.* at 615. The preamble to the Hate Crimes Prevention Act identified several ways Congress believed bias-motivated crimes substantially affected interstate commerce. *See* § 4702, 123 Stat. at 2836. Relevant here, Congress found "[t]he movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence" and "[m]embers of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity." *Id.* In *Morrison*, however, the Supreme Court rejected the sufficiency of nearly identically congressional findings with respect to gender-motivated violent crimes—that they affected interstate commerce "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." 529 U.S. at 615 (internal quotation marks omitted). The Supreme Court has never retreated from this rule.

The same reasoning that led the Supreme Court to reject the sufficiency of the legislative findings in *Morrison* compels rejection of the findings in § 249(a)(2) as well:

64

they offer no specific connection between the activity being regulated and interstate commerce and instead point to general—and ultimately unworkable—principles tied to the down-stream effects of certain crimes on interstate commerce, all of which the Supreme Court has rejected. *See id.* To accept this sort of finding to establish federal jurisdiction would "completely obliterate the Constitution's distinction between national and local authority" because findings offer no limiting principle. *Id.* If a subset of violent crimes can be regulated based on their downstream economic effects, then Congress could rely on the same finding to regulate all violent crime because "a subset of all violent crime[ ] is certain to have lesser economic impacts than the larger class of which it is a part." *Id.*; *see also Lopez*, 514 U.S. at 563–64 (rejecting the Government's "costs of violent crime" and "national productivity" arguments to connect the regulated activity to interstate commerce as insufficient because "if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate").

For these reasons, Congress' findings do not articulate the connection between a bias-motivated punch and interstate commerce so as to be sufficient under the Commerce Clause to allow Hill's prosecution.

D.

The attenuated link between the regulated activity and interstate commerce here demonstrates why Congress lacked the power under the Commerce Clause to regulate the class of activities at issue in this case. Because no intuitive connection between bias-motivated assaults and interstate commerce exists, it's necessary to "pile inference upon

65

inference" to create one. *Lopez*, 514 U.S. at 567. And that's precisely the sort of analysis the Supreme Court rejected in *Lopez* and *Morrison*. *See Morrison*, 529 U.S. at 617–18 (reiterating that "[t]he Constitution requires a distinction between what is truly national and what is truly local").

## III.

The analysis ends under the *Lopez* and *Morrison* factors as they clearly direct that Hill's prosecution under § 249(a)(2)(B)(iv)(I) does not fall within Congress' enumerated powers. Nonetheless, a few additional principles also support this conclusion: (1) avoiding constitutional doubt; (2) federalism; and (3) the rule of lenity.

## A.

"[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Jones*, 529 U.S. at 857 (quoting *United States ex rel. Attorney Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)). Justice Ginsburg, writing for the Supreme Court in *Jones*, relied on this "guiding principle" to reject the Government's proposed "expansive interpretation" of the federal arson statute that would have held that a building was "used in" interstate commerce because it had been used as "collateral to obtain and secure a mortgage" from an out-of-state lender; used to obtain an insurance policy from an out-of-state insurer; and used "to receive natural gas" from out-of-state sources. *Id.* at 855, 857. The Court observed that under this view, "hardly a building in the land would fall outside the federal statute's domain." *Id.* at 857. And, in

rejecting this interpretation, the Court observed that "it is appropriate to avoid the constitutional question that would arise were we to read [the statute] to render the traditionally local criminal conduct in which petitioner . . . engaged a matter for federal enforcement." *Id.* at 858 (internal quotation marks omitted).

As well illustrated by the foregoing discussion, the same concern cautions against the broad view of Congress' Commerce Clause power adopted by the majority in this case. Following the admonition of *Jones*, we should abjure from the constitutionally suspect approach and adopt an understanding that will avoid "grave and doubtful constitutional questions." *Id.* at 857.

B.

I also echo the concerns expressed by Justice Stevens in his concurrence in *Jones* in that this case involves "the kinship between [the Court's] well-established presumption against federal pre-emption of state law, and [its] reluctance to believe Congress intended to authorize federal intervention in local law enforcement in a marginal case such as this." *Id.* at 859 (Stevens, J., concurring) (citation and internal quotation marks omitted). A defendant found liable of violating § 249(a)(2) is subject to a ten-year maximum sentence, while the comparable state offense is a misdemeanor with a maximum sentence of a year. *See* Va. Code § 18.2-57. "[A] criminal law like this . . . effectively displace[s] a policy choice made by" Virginia both with respect to how to punish assaults and whether to increase the penalty based on the motive for the assault. *Jones*, 529 U.S. at 859 (Stevens, J., concurring). While Congress unquestionably has the power to preempt state law in lawful exercises of its constitutional powers, it cannot exceed that authority by

67

using language that encompasses more than it can regulate. Because that is what would occur if § 249(a)(2)(B)(iv)(I) were interpreted in a way to allow Hill's conviction to stand, I cannot join the majority's opinion.

## C.

Lastly, the majority's broad reading of § 249(a)(2)(B)(iv)(I) to encompass Hill's conduct should have been avoided under the rule of lenity. The Supreme Court "ha[s] instructed that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* at 858 (internal quotation marks omitted). Put another way, "the tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008). Because of the grave constitutional doubts surrounding application of § 249(a)(2)(B)(iv)(I) to punches that interfere with any commercial or economic activity in which a victim was engaged, the rule of lenity further counsels against allowing Hill's conviction to stand.

## IV.

Although Hill's prosecution under § 249(a)(2)(B)(iv)(I) exceeded Congress' Commerce Clause power, no one condones Hill's underlying conduct. Workplace violence is inexcusable whatever its motive, and punches are well within a State's general police power to punish. But this case is not about the general immorality or criminality of Hill's conduct; it is about whether Congress can regulate that conduct under its power to regulate activities that have a substantial effect on interstate commerce. For the reasons set out above, Hill's prosecution lacked the requisite connection to interstate commerce

to fall within Congress' Commerce Clause power. I therefore respectfully dissent and would affirm the judgment of the district court.